UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>EDWARD R. HILLS, *et al.*,<br><br>     Defendants. | Case No.  1:16-CR-00329<br><br>Judge Sara Lioi |

**DEFENDANT DR. YAZAN AL-MADANI'S SENTENCING MEMORANDUM**

## I.    INTRODUCTION

Defendant Dr. Yazan Al-Madani came to this country with ambition and a vision: to make a better life for his family by dedicating himself to practicing dentistry. He was pursuing that goal when the events of this case took hold. By numerous accounts, Dr. Al-Madani's connection with this case represents a discrete departure from the humble and compassionate dentist upon whom his family, friends, and colleagues have come to depend. While he personally disagrees with jury's conclusions, Dr. Al-Madani respects the verdicts and does not question them at this stage. In manners consistent with those general verdicts, he contests the loss amount and other factors that suggest his involvement was more egregious that what it was and increase his offense level beyond the intent of the Sentencing Guidelines. Respectfully and reserving all objection to this conviction on appeal, Dr. Al-Madani submits this sentencing memorandum under Local Rule 32.2(c) to outline his individual culpability and various mitigating factors.

## II.    SENTENCING STANDARD

The district court must impose a sentence that is both procedurally and substantively reasonable.[1] To ensure procedural soundness, the Court must consider the factors in 18 U.S.C. § 3553(a). Those factors include the nature and circumstances of the offense; the defendant's history and characteristics; the purposes of sentencing; the United States Sentencing Guidelines; any relevant policy statement by the sentencing commission; the need to avoid unwarranted sentencing disparities; and the need to provide restitution for victims. To be substantively reasonable, a sentence should be proportionate to the seriousness of the offense and the offender, and should be "sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2).[2]

To the extent this Court must decide facts relevant to sentencing, those facts that increase the offense level must be established by a preponderance of the evidence.[3] With respect to conspiracy offenses, individualized findings must be made regarding the scope of the conspiracy and the duration and nature of each defendant's participation in the scheme.[4] "[P]articularized sentencing is mandated, and 'differentiation between coconspirators is required.' "[5] As this memorandum explains, important individual factors weigh in favor of leniency for Dr. Al-Madani.

---

[1] *See Gall v. United States*, 552 U.S. 38, 41 (2007).

[2] *See United States v. Musgrave*, 647 F. App'x 529, 532 (6th Cir. 2016).

[3] *United States v. Woodside*, 642 F. App'x 490, 494 (6th Cir. 2016).

[4] *United States v. Meacham*, 27 F.3d 214, 217 (6th Cir. 1994) (remanding cases for sentencing for failing to distinguish defendants' respective involvement vis-a-via the entire conspiracy); *see also Woodside*, 642 F. App'x at 497.

[5] *Id.*, quoting *United States v. Jenkins*, 4 F.3d 1338, 1347 (6th Cir. 1993).

III.    **DR. AL-MADANI'S PERSONAL HISTORY AND CHARACTERISTICS**

A.    **After becoming a dentist in Jordan, his country of birth, Dr. Al-Madani came to the United States with his family to pursue more promising career opportunities.**

Yazan Al-Madani was born in Madaba, Jordan in 1978. His father was a barber, and his mother was a school teacher. Growing up in Jordan, he excelled in his education. In his last year of high school, Dr. Al-Madani ranked third out of thousands of Madaba students taking the government-administered final exams. He continued on to higher education, all the way through dental school at the University of Jordan. There he met the woman who became his wife, Dr. Manal Sunna.[6] After graduating in 2002, he started practicing dentistry—first in Jordan, then in Saudi Arabia. He began with an internship at a refugee camp in Madaba. Later, he worked seven days per week between three offices that served low-income populations. He also treated many Bedouins, a minority, nomadic population living on the fringes of society. Four years into his career, Dr. Al-Madani understood that remaining where he was would limit his and his wife's opportunities as dentists. Together they decided to relocate to the United States.

Although he had practiced dentistry for years, Dr. Al-Madani's transition to the United States involved many steps. Amidst sitting for certification exams and taking advanced restorative-dentistry courses, Dr. Al-Madani applied to programs where he could complete a required residency. While awaiting his acceptance, he and Dr. Sunna got married, moved to Saudi Arabia, and worked in dentistry together. After interviewing with several programs, he successfully matched with MetroHealth and accepted a residency position. Dr. Al-Madani chose MetroHealth largely because of the hospital's well-regarded training program: residents there

---

[6] *See* Dr. Manal Sunna Letter, at **Ex. 1(a)**. All letters in support of Dr. Yazan Al-Madani are compiled and attached collectively as **Ex. 1**.

had to learn how to handle a large number of patients, many of whom had severe oral-health issues. The couple quickly picked up their lives and moved to Cleveland, Ohio. It is through that residency program, and then later his faculty appointment at MetroHealth, that Dr. Al-Madani came to interact with the other defendants in this case.

### B.    Dr. Al-Madani is a dedicated, hardworking dentist focused on providing excellent care to as many patients as possible.

In many respects, Dr. Al-Madani's identity rests in his chosen vocation as dentist. It is something in which he has invested great pride and satisfaction. Many of his co-workers, including many who worked underneath him, describe him as someone unusually compassionate and focused on patient care.[7] He prioritized patients' interests over all other considerations, including the profitability of a given procedure. Many observers recount compelling stories about Dr. Al-Madani—stories of him providing top-tier care to patients with little ability to pay[8] and working beyond normal hours to make sure each patient got the treatment he believed they deserved.[9] This desire to help those in need was reflected in his decision to invest and build Buckeye Family Dental in Cleveland's Old Brooklyn neighborhood, rather than in a wealthy suburb. By opening a quality dentistry office where many others refused to go, Dr. Al-Madani served an acute need in that community.[10] It was born from his belief that all people, poor or rich, deserve excellent dental care. He worked with patients without insurance who could not

---

[7] *See* Colleague Letters, **Ex. 1(c) − 1(ad).**

[8] *E.g.,* Buckner Letter, **Ex. 1(d)**; Feldman Letter, **Ex. 1(k)**; Bejjani Letter, **Ex. 1(ae)**; Abdelhamid Letter, **Ex. 1(h)**; Rubadi Letter, **Ex. 1(af)**.

[9] *E.g.,* Ghazal Letter, **Ex. 1(c)**; King Letter, **Ex. 1(e)**; Hong Letter, **Ex. 1(j)**;

[10] *See* Old Brooklyn CDC Executive Director Letter, **Ex. 1(ag)**; *see also* Global Cleveland Profile, **Ex. 2**; City of Cleveland MBE Urban Professional Award, **Ex. 3**.

afford the cost of his services. He also participated in an Ohio Department of Health initiative through which his office provided free or reduced-cost services.[11]

Dr. Al-Madani enjoyed his work, and his passion for dentistry transcended any single patient. He wanted what was best for *all* patients. At MetroHealth, he took on many responsibilities beyond providing patient care, including supervising and training residents, chairing departmental committees, supporting the residency program's accreditation, conducting rounds, reviewing and completing patient charts, and giving lectures. He pushed for departmental changes to improve patient care, such as reforming patient scheduling, hiring more dental assistants, developing new workplace policies for prescribing narcotics, and expanding the dentistry offices at MetroHealth's Broadway location.[12] As an attending, he gave much of his time to residents as both a supportive outlet and clinical resource. Several practicing dentists attribute their present professional success in significant part to Dr. Al-Madani's kind mentorship.[13] He took great pride in their development and success as professionals upon leaving MetroHealth.

### C. Friends, co-workers, and fellow church members identify Dr. Al-Madani as a compassionate, caring man who prioritizes his family and faith over all other things.

For as many people who vouch for Dr. Al-Madani's dedication to dentistry, just as many affirm his reputation as a loving husband and father. When not at work, Dr. Al-Madani spent most of his remaining time with his family, particularly his wife, Dr. Sunna. They are proud

---

[11] Ohio Dental Option Letter, **Ex. 4**.

[12] *See* Al-Madani Email Regarding MetroHealth Satellite Expansion, Apr. 23, 2013, **Ex. 5**.

[13] *See* Ghazal Letter, **Ex. 1(c)** (Dr. Al-Madani personally paid for residents' exam materials and mentored them after-hours); Abumenneh Letter, **Ex. 1(h)**; Al-Mashni Letter, **Ex. 1(p)**; Ghreiwati Letter, **Ex. 1(u)**; Bukhari Letter, **1(x)**; Dawoud Letter, **Ex. 1(ab)**; Haddaddeen Letter, **Ex. 1(ac)**.

parents of two children. His son is eight years old, while his daughter is two years old. Friends and fellow family members attest to how central family is for Dr. Al-Madani. Before his incarceration, Dr. Al-Madani's non-working time was primarily spent being active with his wife and children. At least 30 of the letters written in support of Dr. Al-Madani emphasize his bond with his family.[14] He has dedicated himself to his children's physical, moral, and spiritual upbringing, and they look up to him accordingly.

Friends also know Dr. Al-Madani as a spiritual man.[15] He is a lifelong Greek Orthodox Christian. Growing up, he attended St. George in Madaba, Jordan. Since coming to the United States, he has regularly attended St. George Antiochian Orthodox Christian Church.[16] He named his son specifically after St. George, a highly venerated saint, and he's become the godfather to five other children. Although the Al-Madanis live in a city with a strong public-school system, they have sought private, religious schooling for their son.

## IV.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

The offenses revolve around the conducting business at MetroHealth Dentistry in a manner that enriched certain individuals. Dr. Al-Madani was charged with RICO Conspiracy, Conspiracy to Commit Extortion Under Color of Official Right; Conspiracy to Commit Bribery and Offer to Pay Health Care Kickbacks; Conspiracy to Commit Honest Services, Money, and Property Mail Fraud and Wire Fraud; Bribery in Relation to a Federally Funded Program; Money and Property Mail Fraud; Offering or Paying Kickbacks in Connection with Federal Health Care Program; Conspiracy to Obstruct Justice; and False Statements to a Federal

---

[14] *See* Dr. Sunna Letter, **Ex. 1(a)**; George Al-Madani Letter, **Ex. 1(b)**; *see also* **Exhibits 1(g)– 1(h)**, **1(m)–1(n)**, **1(q)**, **1(t)**, **1(x)**, **1(y)**, **1(ab)**, **1(ad)–1(ae)**, **1(ah)–1(ax).**

[15] *See, e.g.*, **Exhibits 1(a)–1(b)**, **1(g)–1(h)**, **1(n)**, **1(ae)**, **1(aj)–1(ak)**, **1(ap)**, **1(av)**, **1(az)–(ba).**

[16] Fr. Ojaimi Letter, **Ex. 1(ap)**.

Agency. He availed himself of his right to a jury trial, resulting in acquittal on four counts of Money and Property Mail Fraud.

Eight of the counts on which Dr. Al-Madani was convicted—Counts 1, 2, 3, 4, 8, 13, 28, and 29—were for a type of conspiracy. Of the ten remaining counts resulting in a conviction:

- seven arose from a single pattern of paying kickbacks in connection with Medicaid, with each check constituting a separate count;

- two were for the solicitation of bribes from MetroHealth residency candidates Dr. Karadsheh and Dr. Yacoub; and

- and one was for giving a false statement to the FBI regarding a "finder's fee."

Without diminishing the seriousness of the offenses for which the jury returned guilty verdicts, these verdicts reflect Dr. Al-Madani's criminal liability without reflecting the extent of his culpability for each offense. His employment situation at MetroHealth—together with his limited involvement—demonstrates that his primary focus was on patient care rather than self-dealing at MetroHealth's or its patients' expense.

Dr. Al-Madani's position upon entering MetroHealth made him prone to misguided acquiescence. He started at MetroHealth in 2007 as a resident dentist and recent immigrant. As with other dentists who had committed to the program, he depended on his MetroHealth position to support his H1-B visa. In the dentistry profession, a residency is a low-paying training position that offers the prospect of continued employment (as an attending) for those high performers the department chooses to retain. During his residency, Dr. Al-Madani worked to prove that he was one of those high performers—to such an extent that Dr. Mathew Kirlough asked him after only a few months whether he would stay as an attending. Dr. Al-Madani's family had taken the substantial risk of uprooting themselves to have the opportunity to practice dentistry in America, and Dr. Al-Madani was determined to make that risk worthwhile. The residency was his big break.

On the other end of the equation was Dr. Edward Hills, who was the head of MetroHealth's dentistry department when Dr. Al-Madani began his residency (and who later ascended to hospital-wide leadership as COO and interim CEO). Dr. Hills had also been a member of the Ohio State Dental Board. By any measure, Dr. Hills was the most acclaimed member of MetroHealth's dentistry department. Dr. Al-Madani always exercised his own professional judgment in caring for patients, but his continued employment depended on Dr. Hills's approval of his performance and of him. And given Dr. Hills's professional stature and charisma, Dr. Al-Madani respected and trusted Dr. Hills as an authority. Unfortunately, only with hindsight can Dr. Al-Madani appreciate the gravity of his mistake.

Thanks to his hard work and Dr. Hills's support, he became one of only a few full-time MetroHealth attending dentists. Although Dr. Al-Madani went along with certain situations as necessary to avoid a conflict with Dr. Hills, evidence never showed Dr. Al-Madani designing schemes for his own personal gain.[17] In many instances, he was unaware of the corrupt nature behind Dr. Hills's dealings, or at least the extent of them, until well after the fact.[18] Besides the disputed issue of whether Dr. Al-Madani wrongly received full-time pay for part-time work, Dr. Al-Madani received no significant personal benefit from the schemes.[19] Ultimately, Dr. Al-Madani's focus was on doing his job; everything else was peripheral. But in doing so, he became a passenger on a train steered by others with more selfish ambitions.

---

[17] Even in the patient-referral scheme, Dr. Al-Madani's involvement was limited. Evidence showed that other defendants planned and organized that referral arrangement. *See* section V.E.4 below.

[18] *See* section V.E below (addressing extent of Dr. Al-Madani's involvement in each scheme).

[19] Dr. Al-Madani disputes that he worked less than the full-time hours he was obligated to work for MetroHealth. *See* section V.C.3.b.ii below. Although the jury convicted him of Conspiracy to Commit Hobbs Act Bribery, this factual issue was not decided by the jury's general verdict.

Despite the multitude of schemes, the criminal activities did not endanger public safety or welfare. No patients were harmed by the defendants' activities, and patient care was not compromised. (Quite to the contrary, the evidence showed that Dr. Al-Madani was a good, highly productive dentist at MetroHealth who provided excellent treatment and also generated cash receipts well beyond his compensation.)[20] None of the activities involved violence or threats of violence. Nothing Dr. Al-Madani did presented a threat to his patients or to the public. There is no indication that, even if he is not deported, he poses any danger to the community going forward. To the extent there were any economic losses, those losses were borne by MetroHealth, not by any patients. Even then, the impact on MetroHealth's own operations was minimal.

Dr. Al-Madani understands the jury's guilty verdicts mean he cannot escape his share of responsibility. He could and should have made different choices along the way to distance himself from what was happening. Yet his origins as a low-ranking resident and his passive association with the corruption offenses should nonetheless reduce his share of culpability.

## V.     UNITED STATES SENTENCING GUIDELINES

Dr. Al-Madani respectfully disagrees with the presentence investigation report's (PSR) calculations under the United States Sentencing Guidelines (USSG). This memorandum addresses them by individual subsections in the order they arise in the PSR. The Court's attention is particularly drawn to subsections V.C (loss), V.D (vulnerable victim), and V.E (mitigating role) below. If the Court accepts the defense arguments only regarding these particular subsections, the Guidelines calculation will be as stated below in Column 2:

---

[20] Alsaad Tr. 886:19–23, June 26, 2018 (**Ex. 6**); Connors Tr. 4181:12–4182:7, July 11 and 12, 2018 (**Ex. 7**); Elrawy Tr. 4742:9–11, July 13 and 16, 2018 (**Ex. 8**).

| | Presentence Investigation Report | Dr. Al-Madani's Position (premised on subsections C, D, and E) |
|---|---|---|
| Base offense level | 12 | 12 |
| More than one bribe, §2C1.1(a)(1) | 2 | 2 |
| Loss under §2C1.1(b)(2) and §2B1.1(b)(1) | 14 | 2 |
| High-level decision-making public official, §2C1.1(b)(3) | 4 | 4 |
| Role in the offense, §3B1.2 | 0 | -4 |
| Obstruction of justice, §3C1.1 | 2 | 2 |
| Vulnerable victim, §3A1.1(b) | 0 | 0 |
| **Total offense level** | **34** | **18** |

### A.      Dr. Al-Madani's offense conduct falls under the Guideline section for gratuities.

As an initial matter, Dr. Al-Madani's offense conduct falls more squarely under §2C1.2 (gratuities) than §2C1.1 (bribes). As the USSG's statutory index indicates, convictions for 18 U.S.C. § 666(a)(1)(B) refer both to USSG §2C1.1 and §2C1.2.[21] The Sixth Circuit has explained that a bribe within §2C1.1 entails a specific quid pro quo for official action, while a §2C1.2 gratuity does not.[22] Dr. Al-Madani gave no gifts intending a certain quid pro quo. Without this intent, the gifts are gratuities.[23] Applying USSG §2C1.2 (gratuities) affects Dr. Al-Madani's sentence level in meaningful ways. The base offense level drops from 12 to 9. The loss calculation is narrowed to only the value of the gratuities paid, without considering

---

[21] *See* U.S. Sentencing Guidelines Manual, App. A.

[22] *United States v. Canestro*, 282 F.3d 427, 431 (6th Cir. 2002) (stating that "a gratuity, as opposed to a bribe, does not require that the illegal payment be offered as a quid pro quo to influence an official action").

[23] *See United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) ("[T]he distinguishing factor between a bribe and an illegal gratuity is the intent behind the payment….").

anything received in return or any governmental loss. And the minimum post-adjustment offense level for offenses involving a high-level decision-making public official decreases from 18 to 15.

**B.    Dr. Hills does not qualify as a high-level decision-making public official under USSG §2C1.1(b)(3).**

Dr. Al-Madani disputes the PSR's four-point enhancement under USSG §2C1.1(b)(3) for the involvement of a high-level decision-making public official vis-à-vis Dr. Hills. MetroHealth is a public hospital, operated and governed on behalf of Cuyahoga County by a ten-member board of trustees. The trustees had the authority and responsibility for the entire management and control of MetroHealth. At all times, the board of trustees was MetroHealth's governing body. The trustees were the "public officials in a high-level decision-making position" under USSG §2C1.1(b)(2), not Dr. Hills.

While Dr. Hills was delegated significant operational discretion in his various managerial capacities, he was always subject to the authority and control of the board. He did not have "direct authority" to make decisions for MetroHealth, as contemplated by Guidelines.[24] And nothing regarding the offenses concerned any such high-level decision-making this enhancement seeks to punish and deter.

Dr. Al-Madani anticipates the government might contend that he too was a public official, thus increasing his base offense level by two points.[25] But Dr. Al-Madani was never a public official; a publicly owned hospital merely employed him as an attending dentist. His job duties involved providing dental services to individual patients and handling administrative responsibilities, just as privately employed dentists do. He did not act in any official governmental

---

[24] USSG §2C1.1, cmt. (n.4(A)).

[25] *See* USSG §2C1.1(a).

capacity, nor did he participate in making any governmental decision.[26] Dr. Al-Madani was not in a position of public trust with official responsibility for a governmental program, and he was not acting under color of law or official right.[27] He was simply a licensed dentist treating patients.

### C. Most of the losses from the schemes—including resident-bribery, OHE, Hobbs Act, and patient referrals—cannot be attributed to Dr. Al-Madani.

While Dr. Al-Madani's loss analysis should follow USSG §2C1.2(b)(2) and be limited to the value of what he paid, this subsection addresses the loss valuations within the more expansive loss framework in USSG § 2C1.1(b)(2). The latter section values losses based on the greatest of four alternatives: (1) value of the payment, (2) benefit received in return for the payment, (3) value of anything obtained by a public official, or (4) loss to the government. Only a single category counts.

In analyzing loss, the Sentencing Guidelines expressly limit the losses attributable to Dr. Al-Madani to the "reasonably foreseeable pecuniary harm" resulting from the offense.[28] This amount constitutes the *actual loss*. The reasonably foreseeability of a loss is based on what "the defendant knew or, under the circumstances, reasonably, should have known, was a potential result of the offense."[29] As an alternative, the loss amount could be based on *intended loss*.[30] Intended loss is limited to "the pecuniary harm that *the defendant purposely sought to inflict*."[31] The Federal Sentencing Commission tightened the meaning of intended loss in its 2015 amendments

---

[26] *See* USSG §2C1.1, cmt. (n.1).

[27] *Id.*

[28] USSG §2B1.1, cmt. (n.3(A)(i)) (by incorporation under USSG § 2C1.1, cmt. (n.3)).

[29] USSG §2B1.1, cmt. (n.3(A)(iv)).

[30] USSG §2B1.1, cmt. (n.3(A)(ii)).

[31] *Id.* (emphasis added).

to the Guidelines, expressly calling for a subjective approach individualized to each defendant. The commission did this because "sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability."[32]

And only losses within Dr. Al-Madani's relevant conduct can be included in the loss.[33] This includes his own activities and, to a limited extent, the activities of others that furthered "jointly undertaken criminal activity."[34] The Sentencing Guidelines clarify that "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."[35] "[T]he accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)."[36] "The government must prove foreseeability and the scope of the jointly undertaken criminal activity by the preponderance of the evidence."[37]

---

[32] United States Sentencing Commission, *Amendments to the Sentencing Guidelines*, 24–25 (Apr. 30, 2015), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf.

[33] USSG §1B1.3(a).

[34] *Id.*

[35] USSG §1B1.3, cmt. (n.3(B)); *see also United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000) ("[T]he scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy.") (quoting *United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993)).

[36] USSG §1B1.3, cmt. (n.3(B)); *see also Swiney*, 203 F.3d at 405 (holding that the district court erred in sentencing by not applying USSC §1B1.3(a)(1)(B)'s reasonable-foreseeability limitation).

[37] *United States v. Jordan*, 20 F. App'x 319, 323 (6th Cir. 2001) (district court improperly conflated at sentencing the conspiracy with the jointly undertaken criminal activity).

Nearly all the losses attributed to Dr. Al-Madani in his PSR resulted from the activities of other people. Yet in most instances, Dr. Al-Madani could not have reasonably foreseen the losses, nor were the losses within the scope of any jointly undertaken criminal activity to which he agreed. Scheme by scheme, the respective loss amounts attributed to Dr. Al-Madani exceed what the Guidelines permit.

### 1. Resident bribery

In trial, evidence showed that Dr. Al-Madani never solicited or received money as part of the resident-bribery scheme. Each residency-applicant who testified about the bribes confirmed that fact.[38] The bribery losses from other defendants' solicitations can be attributed to Dr. Al-Madani only to the extent that the losses were within the scope of his agreement to jointly undertake that particular criminal activity.

Dr. Al-Madani had no role in soliciting bribes from Dr. Ahmad Alsaad or Dr. Issa Salameh. Without evidence that Dr. Al-Madani agreed to jointly undertake these solicitations, the resulting losses cannot be attributed to him.[39] Regarding all the applicants, moreover, the weight of evidence did not show that Dr. Al-Madani knew, or had reason to know, of the potential monetary exchanges involving the applicants. While Dr. Karadsheh scarcely testified that Dr. Al-Madani, a friend of his extended family, told him about his acceptance, that communication made no reference to a payment.[40] Similarly for Dr. Yacoub, evidence showed that Dr. Al-Madani participated on his interview panel (as he had for all applicants), but it did

---

[38] Alsaad Tr. 867:13–23; Fuad Karadsheh Tr. 973:7–11, June 26, 2018 (**Ex. 9**); Yacoub Tr. 1231:12–18, June 27, 2018 (**Ex. 10**); Yazan Karadsheh Tr. 1437:16–1438:1, June 28, 2018 (**Ex. 11**); Issa Salameh Tr. 1586:12–16, June 28, 2018 (**Ex. 12**).

[39] USSG §1B1.3.

[40] *See* Yazan Karadsheh Tr. 1294:11–1297:14.

not further show that Dr. Al-Madani knew, or should have known, that Dr. Sayegh would then target Dr. Yacoub for a bribe.

Evidence showed instead that Dr. Al-Madani affirmatively avoided an attempt to unduly influence the residency-application process. In an evidentiary proffer, Dr. Issa Salameh testified that he approached Dr. Al-Madani to ask him to support Dr. Seim Salameh's application, "and [Dr. Al-Madani] told me he couldn't help, and I appreciated it."[41] This evidence, along with letters of support from former residents,[42] undercuts the idea that Dr. Al-Madani participated in residency-candidate interviews as a guise to facilitate the criminal activity of others.

The loss to MetroHealth from the residents' selections was minimal. MetroHealth still received valuable services from these residents. Evidence showed that the selected residents were objectively qualified and capable of performing their residency duties. For instance, Dr. Yacoub was selected to take on additional responsibilities as chief resident.[43] The other residents successfully fulfilled their residency obligations.

Dr. Al-Madani anticipates the government will take the aggressive line that the residents' entire salaries should be counted in the loss as the value of the benefit received in return for their bribe. *See* USSG §2C1.1(b)(2). That position fails disregards USSG §2C1.1, Application Note 3, which explains that "the value of 'the benefit received or to be received' means the ***net value*** of such benefit." (emphasis in original). By using the residents' full salaries, the government's suggested approach uses the ***gross value*** of the benefit to the residents, without netting out the

---

[41] Issa Salameh Tr. 1602:14–1603:5, 1608:1–18. Although the jury only heard part of this testimony, the Court may consider it for sentencing purposes. Fed. R. Evid. 1101(d) (excepting sentencing proceedings from the Federal Rules of Evidence).

[42] *See* note 13 above.

[43] Yacoub Tr. 1173:24–1174:8, 1181:24–1182:5.

value of the time and labor they provided. The Guidelines' example of this concept is illustrative: "A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000." The government's failure to account for the fair value of the residents' services is the same as failing to net out $130,000 of costs in the contract example. Under the Guidelines, the value of the residents' services must be subtracted to determine the net value of their residencies. This approach follows the Sixth Circuit's opinion in *United States v. Moored*, a loan-fraud case.[44] In *Moored*, the district court had concluded that the defendant intended a loss of $1.7 million: the total amount of loans the defendant fraudulently received. The Sixth Circuit held the loss finding (and resulting enhancement) to be clearly erroneous because evidence showed that the defendant intended to repay the loans and had realistic means to do so.[45] The Sixth Circuit's analysis rested on distinguishing cases where the victim gets nothing in return from where the victim gets the bargained-for performance.[46]

*United States v. Crawley*, cited by the government in its PSR objections, offers no opposing guidance. The district court in *Crawley* found (1) that the employee had not provided honest services and (2) that the value of what he legitimately earned could not be distinguished from what he had not.[47] The court indicated that "where legitimate services could be readily separated," the loss is reduced by the value of services legitimately rendered.[48] Unlike the employee in *Crawley*, the residents fulfilled their obligations to MetroHealth by providing their

---

[44] 38 F.3d 1419 (6th Cir. 1994).

[45] *Id.* at 1429.

[46] *Id.* at 1425–29 (adopting fraud-loss distinction recognized in *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991)).

[47] 533 F.3d 349, 357 (5th Cir. 2008).

[48] *Id.* at 357–58 (recognizing the applicability of the offset approach used in *United States v. Burnes*, 104 F.3d 529 (2d Cir. 1997)).

legitimate services. The *Crawley* analysis also relied on the old definition of "intended loss," which the Guidelines have has since superseded with the narrower defendant-specific definition.[49]

The government's other case, *United States v. Acevedo-Lopez*, does not support its loss position either. By counting only the salary difference between the bribe-payor's old job and his desired job, the court's calculation effectively recognized an offset for the value of bribe-payor's legitimate services.[50] Evidence did not show that the bribe-payor in *Acevedo-Lopez* was qualified or capable of performing his desired job, but he had been able to perform his old job. So applying an offset for his old salary was appropriate. Here, the offsetting value of the residents' services equates to the value of their salaries as residents.

### 2.    Oral Health Enrichment

Because Dr. Al-Madani was never in a position to know of any potential losses from Oral Health Enrichment's activities at MetroHealth, they cannot be an actual or intended loss attributed to him. Evidence showed that Dr. Al-Madani was only a slight participant in one aspect of OHE's overall activities. Julia Solooki, OHE's part-owner who handled its business operations, testified to Dr. Al-Madani's involvement in the clinical assessments:

> [H]e was not someone that facilitated a lot with Oral Health Enrichment. A few times, but this was not — he was not my, kind of, contact for — you know, Dr. Hills — not never, but he wasn't facilitating a lot. Maybe once or twice. I primarily, you know, had my dealing with Sari."[51]

---

[49] *See* section V.C above.

[50] 873 F.3d 330, 335 (1st Cir. 2017).

[51] Solooki Tr. 3082:4–15, July 9, 2018 (**Ex. 13**).

Ms. Solooki commented that Dr. Al-Madani might have facilitated one or two examinations, "if that."[52] From one or two exams, "if that," one cannot conclude that Dr. Al-Madani agreed to jointly undertake a *broad* scheme of criminal activity vis-à-vis OHE.[53] Dr. Al-Madani did not know the broader operations of OHE. He was not otherwise connected to or apprised of its activities, and it never paid him for his limited time.[54] Ms. Solooki hardly knew Dr. Al-Madani.[55] This evidence indicates that Dr. Al-Madani had no basis to know of OHE's broader activities or how they might have negatively affected MetroHealth.

Although it returned a guilty verdict on the conspiracy count, the jury acquitted Dr. Al-Madani on the substantive fraud counts within the OHE scheme. The PSR fails to account for these acquittals by attributing to Dr. Al-Madani a loss from payments made by the OHE clients.

Besides exaggerating Dr. Al-Madani's connection to OHE, the PSR overstates the overall losses from the OHE scheme. Money paid to OHE represents no loss to MetroHealth. OHE could not have diverted any remediation business away from MetroHealth because the hospital did not offer dental-remediation services.[56] In terms of the reviewing dentists' time, the opportunity cost incurred by MetroHealth from OHE's activities was immaterial. Each

---

[52] Solooki Tr. 3228:10–13. Given Ms. Solooki's close knowledge of OHE's activities, her testimony should be credited over Thandeka Cox's less specific testimony that she saw Dr. Al-Madani or Dr. Alqsous supervising exams on "five or ten occasions."

[53] USSG §1B1.3.

[54] Solooki Tr. 3081:23–3082:6.

[55] Solooki Tr. 3229:3–7.

[56] Even if the client fees could count as a loss, the PSR loss amounts would still be over-inclusive. Client fees were paid for OHE's entire remediation program, of which the clinical assessments were only one component. The other component, book-based remediation, had no impact on MetroHealth—so the cost of that component is not a loss.

examination required only a few minutes of the supervising dentist's time and did not hinder the dentist from fulfilling his or her obligations to MetroHealth.[57]

### 3.    Hobbs Act bribery

To secure a conviction against Dr. Al-Madani on the Hobbs Act Conspiracy (Count 2) the government had to prove only that he joined a conspiracy to commit Extortion Under Color of Official Right. The government did not have to show that Dr. Al-Madani knew or could have reasonably foreseen any losses from such a conspiracy. Nor did the government need to show that Dr. Hills fulfilled any quid pro quo.[58] In the indictment, the government identified many things of value allegedly given to Dr. Hills, in exchange for several various official actions:

| Things of Value to Dr. Hills | | Benefits Received in Exchange |
|---|---|---|
| Louis Vuitton Bag | | Lutfi Nassar's selection as a resident |
| Television | | |
| Deposits into Hills's PNC account | → | Full-time pay for part-time work |
| Airfare | | |
| Hotel rooms | ← | Upward adjustments to incentives |
| Perry Payne apartment | | |
| Cash payments | | Resident labor for private clinics |
| MacBook | | |

The evidence touched on these items—some more persuasively than others. Without special verdicts or interrogatories, the jurors did not decide what things Dr. Al-Madani had given or what official action it would have been in exchange for. The jury's verdict does not quantify the specific benefit(s) garnered by Dr. Hills. Likewise, the jury's verdict does not quantify the benefit(s) obtained by Dr. Al-Madani as a result of what was given. Only one quantity may count

---

[57] Walker Tr. 2106:21–2107:5, July 3, 2018 (**Ex. 14**) (exam took 10 to 15 minutes); Jean Kennedy Tr. 2193:12–19, July 3, 2018 (**Ex. 15**) (exam procedure took 3 minutes or fewer); Butriy Tr. 2603:5–25, 2615:21–2616:11, July 5, 2018 (**Ex. 16**) (exams took 2 to 5 minutes and did not impede ability to see patients).

[58] *Evans v. United States*, 504 U.S. 255, 268 (explaining that the offense is complete at the time of the payment to the public official); *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009); *see also* Sixth Cir. Jury Instr., § 17.02, Commentary (updated Jan. 1, 2019).

under USSG § 2C1.1(b)(2).[59] The Court must decide by a preponderance of the evidence the losses from this scheme and the extent any such losses attach to Dr. Al-Madani. Each potential loss is addressed below.

### a.  Value of gifts to Dr. Hills (stream of benefits)

Compared to other conspirators who routinely provided Dr. Hills with airfare, hotel rooms, car repairs, apartments, and cash deposits, Dr. Al-Madani gave far fewer things of value to Dr. Hills. Evidence supported that Dr. Al-Madani contributed $1,293 toward a briefcase, some amount for the TV (purchased by Dr. Elrawy), $1,000 for Dr. Hills's birthday, $500 for Angela Kane, and some amount for Joyce Kennedy's MacBook. Together, the things of value from Dr. Al-Madani add up to roughly $4,500. Accounting for similar contributions from Dr. Alqsous and Dr. Elrawy, evidence supported that they jointly undertook to give about $13,500 worth of things to Dr. Hills.

The relatively limited nature of Dr. Al-Madani's contributions mirrors the limited scope of his agreement to jointly undertake the particular criminal activity. He did not seek opportunities to give things of value to Dr. Hills and resented when he was asked to do so.[60] No witnesses or documents connected Dr. Al-Madani to the hotel rooms or auto repairs paid for Dr. Hills. No witnesses or documents showed that Dr. Al-Madani contributed towards the Perry Payne apartment (something that contradicted Dr. Al-Madani's beliefs about marriage). And no witnesses or documents showed that Dr. Al-Madani ever deposited cash into Dr. Hills's bank account.

---

[59] USSG § 2C1.1(b)(2) permits the use of, among other things, either the value of the payments or the benefits received in return for the payments, whichever is greatest. Thus, the loss may be based on the stream of benefits or be based on the value of what Dr. Al-Madani received in return, but not both.

[60] *See* Al-Madani Text Message, Oct. 22, 2012, Gov. Ex. 4431-S (**Ex. 17**).

### b.  Value of benefits received in return for gifts

Evidence also never showed that Dr. Al-Madani's gifts were tied to a particular official action from Dr. Hills. The witness in the best position to know the expected returns for the gift-giving, Dr. Hussien Elrawy, testified repeatedly that he did not give the gifts expecting there would be a return.[61] Without proof that Dr. Al-Madani agreed that a particular benefit would be obtained in return for a gift, the value of that benefit falls outside the scope of his relevant conduct.[62] Evidence never showed that Dr. Al-Madani asked for anything in return, nor did it show he expected to receive something in return. Like Dr. Elrawy, Dr. Al-Madani was in a position where he would have to undertake a significant risk to decline a request from Dr. Hills.

### i.  *Selection of Lutfi Nassar as a resident*

The selection of Dr. Lutfi Nassar as a resident falls outside of Dr. Al-Madani's relevant conduct. Dr. Al-Madani never agreed that Dr. Nassar's admission would be for anything he gave Dr. Hills. The key discussion regarding Dr. Nassar's admission took place between Dr. Hills, Dr. Alqsous, and Dr. Elrawy.[63] Beyond his standard participation on the residency-interview panel, Dr. Al-Madani had no special involvement or interest in the selection.

Even if Dr. Nassar's selection could attach to Dr. Al-Madani, his salary from 2014 to 2016 was not a loss to MetroHealth. For the same reasons that the residents' salaries do not count as a loss because of the legitimate services they provided,[64] Dr. Nassar's salary should be set aside too. Dr. Nassar provided valuable services to the hospital as a dental resident. In that

---

[61] *See* Elrawy Tr. 4346:13–4347:5 (giving gifts to Dr. Hills was what was required simply "to practice normal dentistry."); *see also id.* 4676:19–4677:1, 4751:22–4752:6.

[62] USSG §1B1.3, cmt. (n.3(B)) ("[T]he accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity.").

[63] Elrawy Tr. 4426:25–4427:8; Alshami Tr. 3457:4–3458:4, July 10, 2018 (**Ex. 18**).

[64] *See* section V.C.1 above.

capacity, he generated revenue for MetroHealth. Multiple witnesses testified that he was a good dentist who did good work.[65] Dr. Elrawy testified that Dr. Nassar is a "very good dentist" and was thus selected to be the chief resident.[66]

### ii.    *Full-time pay for part-time work*

The MetroHealth salaries and workhours for Dr. Elrawy, Dr. Alqsous, and Dr. Al-Madani should not be attributed as a loss to Dr. Al-Madani for several reasons. Initially, they exceed the scope of Dr. Al-Madani's relevant conduct. The government did not prove by a preponderance of evidence that the policy reducing the attending's number of workdays, the flex-time policy, was in return for anything that Dr. Al-Madani (or Dr. Elrawy or Dr. Alqsous) gave Dr. Hills. Nor did the government prove that the flex-time policy resulted in a loss to MetroHealth—let alone one that Dr. Al-Madani could have known of or intended.

Dr. Hills's decision to establish the flex-time policy was not part of any jointly undertaken criminal activity to which Dr. Al-Madani agreed. The evidence demonstrated instead that it was a department-wide measure to address a workplace concern over employee fatigue. According to Dr. Elrawy—the government's lead witness—the change to the four-day workweek aimed to prevent dentists from burning out.[67] The shift in attendings' schedules to four days per week coincided with their work hours being lengthened on those work days. Dr. Elrawy testified that

---

[65] *See, e.g.*, Alshami Tr. 3481:12–14.

[66] Elrawy Tr. 4428:9–12; *see also id.* at 4698:3–6 (adding that Nassar is a "phenomenal doctor").

[67] Elrawy Tr. 4679:8–4683:5.

dentists had worked from 9 a.m. to 5 p.m. over five days.[68] That changed to working open-to-close over four days, seeing every patient who came in that day regardless of how late it took. [69]

Inherently, managers must make managerial decisions. MetroHealth put Dr. Hills in a managerial position overseeing its dentistry department. Inevitably, Dr. Hills at some point would set policies that benefited (and hurt) his attending dentists, including Drs. Elrawy, Alqsous, and Al-Madani. The flex-time policy broadly applied to the whole department, not just the alleged conspirators.[70] In fact, Dr. Elrawy testified that the reason for the policy originally stemmed from Dr. Mathew Kirlough working long hours.[71] This testimony establishes the non-corrupt basis for this departmental policy.

Even if there was a corrupt motive, Dr. Al-Madani could not have agreed to the flex-time policy as part of any exchange with Dr. Hills. The timing of the flex-time policy defies any notion of a quid pro quo. Dr. Hills implemented the policy in February 2010, 22 months before the first thing of value given to Dr. Hills in December 2011.[72] While bribes can technically come after the benefit received, the nearly two years by which the policy predated the first payments to Dr. Hills, without something more, erases any connection between them.[73]

When Dr. Connor, MetroHealth's Chief Medical Officer, sought to reverse the policy, it was a department-wide effort.[74] Dr. Connors observed that the dentists (including

---

[68] Elrawy Tr. 4403:19–4405:25, 4678:19–4679:3. To the extent Dr. Connors took issue with the weekly hours worked by the dentists, that issue would have predated any change from the flex-time policy.

[69] *Id.*

[70] *See* Anderson Tr. 3425:4–3426:1, 3442:20–3443:22, July 10, 2018 (**Ex. 19**).

[71] Elrawy Tr. 4678:19–4679:3; *see also id.* at 4403:22–4405:25.

[72] *See* Indict. ¶ 110 (alleging a $2,000 cash deposit as the earliest in stream of benefits to Dr. Hills).

[73] This weigh in favor of applying USSG §2C1.2 (gratuities), as discussed above in section V.A.

[74] *See* Connors Tr. 3962:21–3963:17, 3967:21–3968:25, 4163:13–21, 4165:10–4169:1.

Dr. Al-Madani) sincerely believed there was nothing improper about the policy.[75] Neither Dr. Al-Madani nor anyone else in the department was in position to know whether or how the flex-time policy needed to be cleared first with the hospital-wide administration.

In addition, implementing the flex-time policy resulted in no loss to MetroHealth, particularly not one known to or intended by Dr. Al-Madani.[76] As explained by Dr. Elrawy, the policy was enacted in response to dentists working longer days to meet their growing patient and administrative demands.[77] The policy permitted full-time employees to work their same full-time hours in four days instead of five. Although the policy was not approved by Dr. Connors, the policy did not reduce the dentists' workhours, and the government did not introduce evidence that the attendings worked fewer total hours as a result. The policy simply changed how the doctors *allocated* those hours across the workweek based on the intensifying demands on MetroHealth's dentists.[78]

Production (measured by billings and receipts) depends on the time dentists spend working with patients, not the days on which they work. Zero loss resulted from changing the days that their hours fell on. Dr. Elrawy testified that he worked 40 hours per week ***before*** the change to a four-day workweek: "At that time we used to work like 9:00 to 5:00, five days a week"[79] Evidence demonstrated that Dr. Al-Madani worked at least 40 hours per week at MetroHealth (and often more) after the change to flex-time. Dr. Elrawy testified that he and the

---

[75] Connors Tr. 4179:20–4181:17 ("[T]he issue wasn't that the people who had been acting according to that policy were — they were in fact — they thought what they were doing was okay"); *see also id.* at 3896:7–19. Part of this testimony drew a sustained objection, but that does not preclude the Court from considering it for sentencing. *See* Fed. R. Evid. 1101(d).

[76] USSG §2B1.1, cmt. (n.3(A)).

[77] Elrawy Tr. 4678:19–4679:3, 4681:8–4682:19.

[78] Elrawy Tr. 4403:19–4405:25, 4678:19–4683:5.

[79] Elrawy Tr. 4678:14–4679:3.

other dentists then worked long hours on the days they worked.[80] And the high production from Dr. Elrawy, Dr. Alqsous, and Dr. Al-Madani while working four days per week suggests they saw a full load of patients throughout each week.[81]

Evidence never showed that Dr. Al-Madani knew, before Dr. Hills's departure from MetroHealth, that working four days per week was unacceptable to the hospital-wide administration. Dr. Connors testified to his personal expectation that full-time physicians work a five-day workweek but identified neither a written policy to that effect nor how the dentists would have known about that expectation.[82] It was not a known policy until Dr. Connors imposed it on MetroHealth's dentistry department in 2015. He confirmed that a 1.0 FTE (full-time equivalent) equates to 80 hours over two weeks, although he characterized it as a mere budgeting metric.[83] Other MetroHealth policies, notably the attendance-standards policy, reflected the same 80-hour biweekly threshold.[84] When MetroHealth administrators raised the five-day workweek issue with

---

[80] According to his testimony, before the schedule change, Dr. Elrawy worked forty hours per week—9:00 am to 5:00 pm, Monday to Friday. With the extended hours after the change to flex time, Dr. Elrawy testified that he worked more than 40 hours per week—sometimes 50 to 60 hours per week, and occasionally to as late as 11:00 pm. Elrawy Tr. 4678:19–4679:3, 4684:20–4685:5 ("Well, I never count, but always like a lot of hours. Sometimes 50, 60."); *see also* Anderson Tr. 3437:11–3438:3 (co-worker at MetroHealth Broadway confirming that Dr. Al-Madani always worked his scheduled days, rarely took a lunch break, and occasionally worked on his off days); Kime Tr. 2859:17–2861:5, July 6, 2018 (**Ex. 20**).

[81] *See* MetroHealth Collections and Compensation Analyses (highlighted), Govt. Ex. 4109–11, 4113–14, highlighted (**Ex. 21**); Meehan Tr. 4880:2–18, July 16 and 17, 2018 (**Ex. 22**).

[82] Connors Tr. 3888:21–3889:17; 3892:21–3894:9, 4174:8–24 (opining on the merits of a physician 40-hour workweek without referring to a MetroHealth policy); *see also* Connors Tr. 3948:21–3949:4, 3950:2–10, 4174:8–24, 4199:4–6, 4216:23–25, 4219:21–4220:3(speaking of full time in terms of "effort").

[83] Connors Tr. 3942:11–3943:1, 3949:18–19.

[84] MetroHealth Attendance-Standards Policy, Al-Madani Ex. FP (**Ex. 23**); MetroHealth Physician Benefits Summary (**Ex. 24**); Department of Dentistry Flextime Memorandum, Govt. Ex. 4607, (**Ex. 25**); *see also* Lewis Tr. 652:17–22, June 25, 2018 (**Ex. 26**); Dr. Al-Madani Faculty Reappointment Application, 2012 (**Ex. 27**).

Dr. Al-Madani, it had him choose between working 5 days (1.0 FTE) and 4 days (0.8 FTE). But the email confirming this arrangement reflected that Dr. Al-Madani would reduce his **hours** on his four days to drop to part-time (0.8 FTE) status.[85] Had Dr. Al-Madani not been working hours consistent with his full-time 1.0 FTE status, dropping him to 0.8 FTE (while still working four days per week) would not have involved a concomitant reduction to his work hours.

If the Court were to attribute a loss to Dr. Al-Madani based on part of his and the other attendings' salaries (as the PSR does), counting that loss creates a partial offset from an increase in calculated incentives. Under the departmental incentive calculation,[86] a decrease in salary necessarily results in an increased calculated incentive. To avoid double-counting of any losses from the dentists' compensation, losses premised on the dentists receiving too much salary must be offset with the increased calculated incentives they would have received had they been paid that lower salary. For the vast majority of months where the dentists already had earned a calculated incentive, the offset would equal 25% of the salary loss. Once the dentists' receipts have covered their compensation, each additional dollar generated $0.25 in calculated incentive.

### iii.    *Incentive payments*

The Sentencing Guidelines exclude the attendings' incentive adjustments in computing the loss amount attributable to Dr. Al-Madani on two grounds. First, the incentive adjustments were beyond Dr. Al-Madani's relevant conduct because he (or Dr. Elrawy or Dr. Alqsous) could

---

[85] Legerski Email Regarding July 6 Meeting, Al-Madani Ex. FJ (**Ex. 28**) ("[Y]ou have decided to decrease your hours to a part-time status."); Al-Madani Position Action Form, Govt. Ex. 317 (**Ex. 29**); *see* Connors Tr. 4176:13−4178:18.

[86] Calculated Incentive = 25% * (Receipts − (Salary + Benefits)).

not have given anything to Dr. Hills expecting the adjustments as a return. Second, the adjustments do not fit within the Guidelines' definitions for "actual loss" or "intended loss."[87]

The key fact underpinning both grounds for exclusion is Dr. Al-Madani's unawareness of how the incentives were calculated. Dr. Elrawy testified that neither he, nor Dr. Al-Madani, nor any of the other attendings understood how the incentives were calculated.[88] Dr. Hills controlled the incentives, and he directed Cindy Meehan, who performed the calculation, to not share the calculations with the attendings.[89] MetroHealth attending dentists did not know how the incentives were determined. Regardless of any adjustments, the attendings typically earned a significant monthly incentive according to the department-wide formula.[90] So it was not apparent from their paychecks that their incentives had been adjusted from the baseline formula. Without understanding whether or how Dr. Hills was adjusting his incentives, Dr. Al-Madani could not have agreed they were part of the "jointly undertaken criminal activity" relevant for sentencing.

Given the evidence that Dr. Al-Madani did not know about the incentive calculations, the adjustments are also not an actual loss that attaches to him. Only the "reasonably foreseeable pecuniary harm" from the offense counts as an actual loss.[91] "Reasonably foreseeable pecuniary harm" is further defined as the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."[92] This

---

[87] USSG §2B1.1, cmt. (n.3(A)).

[88] Elrawy Tr. 4343:6–15, 4406:22–4408:7 (describing Dr. Hills as leveraging the attendings' incentives as "a sword over our own neck").

[89] Meehan Tr. 4806:21–4808:7, 4909:21–4910:7, 4960:7–4961:12.

[90] *See* MetroHealth Incentives Spreadsheet, Govt. Ex. 4803 (**Ex. 30**) (column named "Calculated Incentive Payment" or "Excess Calculated Incentive").

[91] USSG §2B1.1, app n.3(A)(i).

[92] *Id.* at §2B1.1, app n.3(A)(iv).

definition bases each defendant's loss on the losses that the particular defendant knew or should have known about. Until Ms. Meehan's *ad hoc* report in 2015 (*after* Dr. Hills had left MetroHealth) Dr. Al-Madani did not know how his incentives were calculated. As that report indicated, Dr. Al-Madani's incentive did not keep pace with the department-wide formula. [93]

Were the Court to find that the attendings' upward incentives adjustments count toward the loss attributed to Dr. Al-Madani, those adjustments should be offset, in part, by downward adjustments made to the incentives during other months. The PSR's loss amount from the incentive adjustments, $92,829.00,[94] fails to account for the many downward adjustments made to the dentists' incentives. Only the *net* upward adjustments to the incentive payments—i.e., accumulated deviations from the department-wide incentive formula—represent a loss to MetroHealth. Under the departmental formula, attendings' incentives equaled 25% of the monthly excess receipts (collections minus total compensation) they generated for MetroHealth.[95] The attendings' *net* adjustments, identified below, come well short of the PSR's loss amount:

- **Dr. Alqsous**—$36,693.00 of the PSR's total incentives loss relates to Dr. Alqsous. Dr. Alqsous's incentive payments were downwardly adjusted in November 2014 and January 2015.[96] The combined reduction, $21,520, offsets against the loss, leaving a difference of $15,173.

- **Dr. Elrawy**—The three incentive payments to Dr. Elrawy from November 2012 to January 2013, tallying $21,466 in adjustments, were not losses—they were restoration payments. Earlier in 2012, Dr. Elrawy's incentive payments were calculated at a rate lower than the departmental 25-percent rate. Ms. Meehan testified this was a temporary measure to see whether Dr. Elrawy's (and Dr. Al-Madani's) revenue

---

[93] Meehan Tr. 4925:1–4928:12; Al-Madani 2014 Incentive Calculation, Al-Madani Ex. HZ (**Ex. 42**).

[94] Because this amount matches the loss found in ¶ 175 of the indictment, this memorandum responds to the incentives identified in that allegation.

[95] In other words, dentists received a calculated incentive only when their monthly collections exceeded their monthly salary and benefits.

[96] **Ex. 30**, MetroHealth Incentives Spreadsheet at 65, 69.

production would still cover his new salary and benefits.[97] From February to September 2012, Dr. Elrawy received $21,624 less in incentives than he would have under the formula. His three upwardly adjusted incentives merely brought Dr. Elrawy back in line with the department.

- **Dr. Al-Madani**—From 2010 to 2014, Dr. Al-Madani received less in actual incentives than prescribed by the departmental formula.

  - 2010 and 2011: Incentives had a net decrease of $346.[98]

  - 2012 and 2013: Dr. Al-Madani also received restoration payments to cancel out his diminished incentives rate during 2012.[99] Because of the reduced rate, Dr. Al-Madani's calculated incentives exceeded his actual incentives by $12,718 in 2012, which was paid back to him in January 2013.[100] After this payment, no further adjustments were made to Dr. Al-Madani's in 2013.

  - 2014: Dr. Al-Madani received $7,305 less in his actual incentives than what he would have gotten under the department-wide formula.[101] While his upward adjustments totaled $5,876, his downward adjustments added to $13,181.

### 4. Buckeye Family Dental patient referrals

The evidence demonstrated that any losses incurred by MetroHealth from the patient-referral arrangement would be been insubstantial. Many witnesses testified that MetroHealth had more dentistry patients than it could handle in early 2014 and that Dr. Hills specifically advised staff they could send *overflow* patients to Buckeye Family Dental.[102] This authorization did not divert patients away from MetroHealth that it could handle.

The preponderance of evidence did not show many referrals resulted from Dr. Hills's March 2014 meeting announcement. Dr. Alshami testified that he observed Dr. Alqsous

---

[97] Meehan Tr. 4881:22–4883:13, 4908:13–4909:19.

[98] Meehan Tr. 4919:2–11; *see id.* at 4912:24–4919:11 (reviewing 2010 and 2011 adjustments).

[99] Meehan Tr. 4881:22–4883:13, 4908:13–4909:19.

[100] Meehan Tr. 4921:16–4923:17, 4932:16–23.

[101] MeehanTr. 4928:18–4930:18.

[102] Elrawy Tr. 4707:12–16; Trimarchi Tr. 2757:9–2758:4, 2765:18–25, July 5, 2018 (**Ex. 31**); Elmallah Tr. 3545:17–3546:1, July 10, 2018 (**Ex. 32**); Alshami Tr. 3462:13–17, July 10, 2018.

referring patients on *two* occasions.[103] And while Thandeka Cox testified that she thought 100 patients had been referred, she later conceded she did not personally observe any referrals. She reached her 100-patient guess based simply on patients who had stopped a course of treatment, which could have happened in the natural course of business. During pre-trial proceedings, government counsel represented that it had identified three referred patients connected to four Medicaid checks.[104] But this evidence was not introduced during trial. Nor did other evidence show what revenue, if any, MetroHealth had lost from referrals.

### 5. Other RICO losses — MetroHealth labor for Noble Dental Care

The PSR appears to include in the loss attributed to Dr. Al-Madani the payments that Chan Wang made to Dr. Hills for dentists to staff Noble Dental Care in 2009 and 2010. Whatever amount Ms. Wang paid Dr. Hills, it represents no actual or intended loss attributable to Dr. Al-Madani. He affirmatively extricated himself from any dealings between Dr. Hills and Ms. Wang. Evidence showed that Dr. Al-Madani, at his insistence, was paid separately by Ms. Wang for working a single day per week over a short span (on his off days from MetroHealth).[105] Dr. Al-Madani worked many hours at MetroHealth during this time.[106]

Any losses from dentists working part-time for full-time pay would overlap with the loss from Dr. Hills's arrangement with Ms. Wang. The alleged loss from both activities is MetroHealth's loss of labor. Including these payments with the alleged workday loss violates §2C1.1(b)(2)'s restriction against double-counting.

---

[103] Trial Tr. 3463:14–20, July 10, 2018 (Alshami).

[104] Motion Hrg. Tr. 32:9–24, June 1, 2018 (**Ex. 33**).

[105] Wang Tr. 2661:18–2662:11, 2720:23–2722:15, July 5, 2018 (**Ex. 34**); Al-Madani 1099-MISC, Al-Madani Ex. GS (**Ex. 35**).

[106] Kirlough Residency-Accreditation Email, Aug. 8, 2010 (**Ex. 36**) (thanking Dr. Al-Madani and others for logging "countless 60–80 hour weeks").

For the Court's benefit in determining the loss amount attributed to Dr. Al-Madani, this table lists the PSR loss amounts he contests:

| PSR Losses Contested by Dr. Al-Madani | |
|---|---|
| Solicitations from resident candidates | $80,000.00 |
| OHE client fees | $111,900.00 |
| Lutfi Nassar's salary (2014−16) | $101,624.00 |
| 20% of Sari Alqsous's salary (2010−14) | $194,115.93 |
| 20% of Yazan Al-Madani's salary (2010−14) | $211,508.42 |
| 20% of Hussein Elrawy's salary (2010−14) | $202,261.53 |
| Incentive adjustments | $92,829.00 |
| NDC checks to Dr. Hills for patient referrals | $17,600.00 |
| Chan Wang payments to Dr. Hills | $107,461.00 |
| Unidentified loss from PSR[107] | $27,054.00 |

### D.  None of the resident candidates or any MetroHealth patients were vulnerable victims.

The Court should reject any request for a vulnerable-victim enhancement because (1) the resident candidates were not victims within the Guideline's vulnerable-victim definition, and (2) MetroHealth patients were not victims of Dr. Al-Madani. The residency candidates were intelligent, well-educated dentists who applied to and had the option to choose between many programs. While MetroHealth was a desirable program, it was not their only option. And from the candidates' perspectives, there was a clear quid pro quo for anything they paid.[108] Although the government may suggest otherwise, Dr. Al-Madani's later conversation with Dr. Karadsheh is not relevant to this adjustment. It occurred years after Dr. Sayegh had solicited a bribe from Dr. Karadsheh—after he and Dr. Al-Madani had been friends for years.[109]

---

[107] The PSR states a total loss of $1,146,353.88, but the specific loss items add up to only $1,119,299.88.

[108] USSG §3A1.1.

[109] *See* sections V.E.5 and V.F below.

Dr. Al-Madani did not victimize MetroHealth patients. As explained above, the flex-time policy was not part of any jointly undertaken criminal activity that Dr. Al-Madani agreed to. Dr. Hills extended the flex-time policy to the dentistry department almost two years before any of the Hobbs Act payments. As noted in his support letters, Dr. Al-Madani went to great lengths to help Cleveland's low-income dental patients.[110] The government might speculate that MetroHealth could not hire additional dentists because of the attendings' full-time salaries. Yet that ignores the trial evidence showing that the attendings—however many days or hours they worked—generated cash receipts for MetroHealth well beyond their salaries.[111] MetroHealth's decision to not hire additional more dentistry staff to handle the large influx of CarePlus patients should not fall on Dr. Al-Madani.

### E.     Dr. Al-Madani's lesser role in the offense fits within the offense-level decrease under USSG § 3B1.2.

Dr. Al-Madani's lesser role in the offenses justifies an offense-level decrease under USSG §3B1.2. The Sentencing Guidelines provide a 2-point decrease for "minor" participants and a 4-point decrease for "minimal" participants.[112] The Guidelines explain these categories:

- **Minimal participant**—"It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant".

---

[110] *See* Buckner Letter, **Ex. 1(d)**; Feldman Letter, **Ex. 1(k)**; Bejjani Letter, **Ex. 1(ae)**; Abdelhamid Letter, **Ex. 1(h)**; Rubadi Letter, **Ex. 1(af)**;*see also United States v. Stokes*, 392 F. App'x 362, 370–71 (6th Cir. 2010) (existence of a physician-patient relationship with a defendant is insufficient to establish vulnerable-victim enhancement).

[111] *See generally* MetroHealth Incentives Spreadsheet (showing calculated incentives based on collections in excess of total compensation).

[112] USSG §3B.1.2. Under this section, cases falling between the categories result in a 3-point decrease.

- **Minor participant**—"[A] defendant . . . who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."

Where a person falls among these categories depends on the totality of circumstances and is highly fact-dependent.[113] The Guidelines provide a non-exhaustive list of factors for this adjustment, many of which pertain to Dr. Al-Madani. He did not plan the criminal activities, nor did he have decision-making authority regarding them. His participation within the schemes was limited, contributing sparingly and only when prompted by others.[114] In most instances—such as the resident-bribery solicitation, OHE, Hobbs Act bribery, free labor for NDC—he did not understand the scope of the potential criminal activity.[115]

### 1.    Resident bribery

The jury's verdict indicates they concluded that Dr. Al-Madani acted behind-the-scenes for the bribes solicited from Dr. Yacoub and Dr. Karadsheh. But that was the limit of the evidence. Even if Dr. Al-Madani called Dr. Karadsheh to give him a heads-up about his selection and gave Dr. Sayegh the phone number for Dr. Yacoub, this conduct does not make him as culpable as those who planned and carried out the actual solicitation. The residents testified that they never gave Dr. Al-Madani money, and he never asked them for any. Dr. Al-Madani got no payment or benefit from this scheme.

### 2.    Oral Health Enrichment

Dr. Al-Madani had no role in developing, planning, organizing, or coordinating the activities of Oral Health Enrichment. Evidence showed that, on very few occasions,

---

[113] *Id.* at §3B.1.2, cmt. (n.3(C)).

[114] *Id.*

[115] *See* USSG §3B.1.2, cmt. (n.3(C)) (identifying as a factor "the degree to which the defendant understood the scope and structure of the criminal activity").

Dr. Al-Madani helped with an OHE clinical examination. But as Julia Solooki testified, Dr. Al-Madani was not otherwise connected to or apprised of OHE activities.[116] Dr. Al-Madani was a reviewer of last resort: someone asked to step in only when others were not available.[117] When he helped, he received nothing in return and proceeded on with his work day.[118]

### 3.    Hobbs Act bribery

Dr. Al-Madani contributed to some significant things of value for Dr. Hills, but he did not seek opportunities to do so. Compared to the many things that Dr. Hills received from other dentists, Dr. Al-Madani gave Dr. Hills only a few select things of value. These things added up to approximately $4,500 worth of cash and gifts. When Dr. Al-Madani gave something to Dr. Hills, it was always part of a larger gift from him and others. He never gave Dr. Hills anything on his own accord.

The testimony of Dr. Elrawy, who more deeply participated in the gift-giving, described the nuanced dynamics behind the attendings' giving. Dr. Elrawy, Dr. Alqsous, and Dr. Al-Madani *had* to give things to Dr. Hills. "No" was not a realistic option.[119] Dr. Hills controlled everything in their department and could have made their lives miserable.[120] This testimony is consistent with Dr. Al-Madani's express resentment of Dr. Hills's requests.[121]

---

[116] Solooki Tr. 3081:23–3082:14.

[117] *See* Hills-Alqsous Text Messages, May 30, 2012 (**Ex. 37**).

[118] Spielmaker Tr. 3776:13–24, 3778:4–3779:10, July 11, 2019 (**Ex. 38**); *see also* Butriy Tr. 2603:5–25, 2615:21–2616:11 (exams took 2 to 5 minutes and did not impede ability to see patients).

[119] Elrawy Tr. 4346:13–4347:5, 4676:19–4677:1, 4751:22–4752:6, 4675:19–4677:1.

[120] Elrawy Tr. 4342:19–4344:9, 4346:13–4347:5 ("Well, you can lose your job, your — you can have tons of patients. You're not going to have assistants. You're going to push a lot of administration people against you. So basically your life would be miserable at MetroHealth if you're not on the good side of Dr. Hills.").

[121] **Ex. 17**, Al-Madani Text Message, Oct. 22, 2012.

### 4. **Buckeye Family Dental patient referrals**

As a part-owner of Buckeye Family Dental and Noble Dental Clinic, Dr. Al-Madani probably derives most of his culpability from the patient-referral arrangement. Yet even in that scheme he was not the primary actor. Evidence demonstrated that, while Dr. Al-Madani was not completely out of the loop, he was not organizing or actively coordinating the arrangement. Dr. Elrawy testified that Dr. Alqsous alone said was he was meeting with Dr. Hills to negotiate a deal for the referrals, and that Dr. Alqsous took credit for setting Dr. Hills up for the 1099-MISC.[122] Dr. Alqsous also wrote the checks and sent Dr. Hills at least one message about delivering them. When Dr. Al-Madani wanted Dr. Hills to review a referral form he designed (to document any referrals), he had to ask Dr. Alqsous to make sure that Dr. Hills saw the form.[123]

Importantly, the design of the referral arrangement ensured that patients within MetroHealth's capacity stayed at MetroHealth. Those who attended the department meeting about the referrals testified that Dr. Hills gave permission to refer only "overflow" patients.[124] This was not an order; the decision to refer a patient was still entrusted to the discretion of those working in the department. Evidence showed that only a few referrals actually occurred.

### 5. **Conspiracy to obstruct justice**

The conspiracy to obstruct justice originated from Dr. Hills, and he pursued it by pressuring his attendings. The Red's Steakhouse recording of Dr. Hills's speech to Dr. Elrawy, Dr. Alqsous, and Dr. Al-Madani illustrates the power dynamic among them. During the entire recording, Dr. Al-Madani says nothing but a few innocuous sentences and is barely mentioned.

---

[122] Elrawy Tr. 4493:8–4496:16.

[123] *See* Al-Madani Text to Alqsous, Mar. 28, 2014, Govt. Ex. 5016-S (**Ex. 39**).

[124] Elrawy Tr. 4707:12–16; Trimarchi Tr. 2757:9–2758:4, 2765:18–25; Elmallah Tr. 3545:17–3546:1; Alshami Tr. 3462:13–17.

Most of the recording features Dr. Hills ranting extemporaneously about the importance of loyalty.

While Dr. Hills bears most of the responsibility for the obstruction conspiracy, Dr. Al-Madani recognizes his culpability from the jury's verdict. Admittedly, Dr. Karadsheh testified that he had a meeting with Dr. Al-Madani during which he advised Dr. Karadsheh to not tell anyone about the money Dr. Karadsheh said was paid to get him into the residency. In doing so, Dr. Al-Madani mentioned the possibility of deportation. Despite the weighty overture, in mitigation, Dr. Al-Madani acted consistently with his sincere interest in helping Dr. Karadsheh. At the time, he and his wife were close friends with Dr. Karadsheh and his wife.[125] Dr. Al-Madani employed Dr. Karadsheh at his private office and continued to do so into 2016.[126] Dr. Al-Madani understood that Dr. Karadsheh likely committed a crime that, as Dr. Al-Madani appreciates all the more now, can result in deportation.

### 6. False statement to law enforcement

While Dr. Al-Madani alone bears the blame for his false statement to law-enforcement officials, that statement did little to hinder the investigation. Two law-enforcement officers approached him in his driveway as he was leaving for work in the morning.[127] During the interview, Dr. Al-Madani spoke to his *belief* that the payments were a finder's fee but disclaimed any certainty on that point. [128] As testified by Agent Shaun Roth, Dr. Al-Madani simultaneously

---

[125] Yazan Karadshah Tr. 1391:11–1393:3, 1406:2–4.

[126] Yazan Karadsheh Tr. 1311:13–19.

[127] Roth Tr. 5488:5–24, July 18, 2018 (**Ex. 40**).

[128] Roth Tr. 5508:14–17.

qualified that he had not reviewed Noble Dental Clinic's financial information and referred the agents to his accountant.[129]

Overall, Dr. Al-Madani did not seek these activities for his benefit; he participated as needed to continue his work as a MetroHealth dentist. Under the Guidelines, Dr. Al-Madani's lesser role in the offenses merits a four-point decrease for minimal participation.

### F.      Obstruction of justice

Dr. Al-Madani contests an increase to his sentence level under USSG §3C1.1 for obstruction of justice. For this section to apply, Dr. Al-Madani must have willfully obstructed or impeded the administration of justice vis-à-vis the investigation, prosecution, or sentencing.

Although it resulted in a separate conviction, the "finder's fee" statement does not fit this Guideline's enhancement. It covers materially false statements to a law-enforcement officer "that *significantly* obstructed or impeded the official investigation or prosecution of the instant offense."[130] This is a higher bar than under 18 U.S.C. § 1002(a)(2), the basis for Dr. Al-Madani's false-statement conviction. While the statute also requires a materially false statement, it does not require that the statement have any particular effect on the investigation. While the jury decided that Dr. Al-Madani's statement was materially false, the statement would not have significantly obstructed or impeded the investigation. Dr. Al-Madani spoke to his *belief* that the payments were a finder's fee but disclaimed any certainty on that point. [131] He explained that he did not review Noble Dental Clinic's financial information and offered his accountant's information.[132]

---

[129] Roth Tr. 5509:13–5511:20.

[130] USSG §3C1.1 (emphasis added).

[131] Roth Tr. 5508:14–17.

[132] Roth Tr. 5509:13–5511:20.

When Dr. Al-Madani talked with Dr. Karadsheh about not telling others about the bribes Dr. Karadsheh had paid, he was giving advice to a friend.[133] He was not willfully attempting to obstruct or impede a law-enforcement investigation, especially since Dr. Karadsheh could not recall whether one was ongoing.[134] While Dr. Al-Madani mentioned the (real) threat of deportation, he did not make any reference to law enforcement.

Finally, as testified by Litsa Voulgaris, the accountant for Noble Dental Clinic, she likely coordinated with Dr. Alqsous to get the information needed to prepare Dr. Hills's Form 1099.[135] Dr. Alqsous managed Noble Dental Clinic, while Dr. Al-Madani managed Buckeye Family Dental.[136] And the evidence also showed that Ms. Voulgaris received a Form W-9 for Dr. Hills in December 2013, months before the investigation began in May 2014.[137]

## VI. DOWNWARD DEPARTURES FOR MITIGATING CIRCUMSTANCES

Under 18 U.S.C. § 3553(a)(5)(A), this Court may downwardly depart from the Guideline's sentencing range in line with policy statements found within the Guidelines. The following mitigating circumstances pertain to Dr. Al-Madani, and allow for downward departure.

### A. Dr. Al-Madani's involvement was the product of coercion and duress from Dr. Hills.

The Guidelines recognize that while defendants might not be able to advance coercion and duress as a complete defense at trial, it can still justify a downward departure.[138] "The extent

---

[133] *See* Yazan Karadsheh Tr. 1391:11–1393:3. Dr. Karadsheh separately testified that he remained friends with Dr. Al-Madani until law enforcement raided the dental clinics, which occurred in September 2015. *Id.* at 1423:21–1424:2.

[134] Yazan Karadsheh  Tr. 1308:22–1309:4.

[135] Voulgaris Tr. 4278:9–24, July 12, 2018 (**Ex. 41**).

[136] Roth Tr. 5508:3–9.

[137] Voulgaris Tr. 4277:4–4278:24, 4309:1–11.

[138] USSG §5K.12.

of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be."[139]

Dr. Elrawy and other witnesses testified to a culture of fear and extortion under Dr. Hills. As noted above, Dr. Elrawy explained that his payments to Dr. Hills were not voluntary, but extortion. Although not threatened with physical harm, Dr. Hills stood in a position to inflict serious damage on their careers. He was a widely known and respected dentist who wielded great authority within MetroHealth. Dr. Al-Madani had the added vulnerability of his immigration status. He is not a citizen, but a permanent resident. He depended on his employment to support his green card. It was reasonable for Dr. Al-Madani to fear that Dr. Hills, given his MetroHealth position and standing, could impair Dr. Al-Madani's ability to stay in the United States if Dr. Hills had a reason to turn on him.

Dr. Hills valued loyalty. When he spoke to the attendings during the dinner at Red's Steakhouse, he made very clear how he felt about people he could not trust. This one-sided dinner speech demonstrates the dominance Dr. Hills exerted over the other dentists.

## B.  Dr. Al-Madani's involvement represents aberrant behavior from his law-abiding life.

The Guidelines permit a downward departure for aberrant behavior. The departure may apply when the defendant committed a single criminal occurrence that (1) was committed without significant planning, (2) was of limited duration, and (3) represents a marked deviation by the defendant from an otherwise law-abiding life.[140] While Dr. Al-Madani may not strictly fit this

---

[139] *Id.*

[140] USSG §5K2.20.

definition (there was more than one criminal occurrence over the span of a couple years), the rationale behind this policy statement—extending partial forgiveness for a blip from one's character—adheres to Dr. Al-Madani's record as an upright member of the community. Though he cannot fit the Guideline definition, Dr. Al-Madani requests a downward departure based on the inconsistency between his law-abiding nature[141] and his activities in this case.

### C.    Dr. Al-Madani's incarceration poses a major risk to his family's ability to fulfill its caretaking and financial responsibilities.

The Guidelines also recognize the potential to downwardly depart for Dr. Al-Madani's family losing caretaking and financial support.[142] Besides his wife and two young children, Dr. Al-Madani's parents, retirees in their seventies, also live at his home. Without Dr. Al-Madani home, his family will suffer the loss of crucial caretaking and financial support. Since Dr. Al-Madani went to prison after trial, Dr. Sunna has been overwhelmed with caring for the children and the parents, while trying to work and keep her dentistry practice afloat.[143] She has had to contacted family members to borrow money. Dr. Al-Madani had always provided a substantial amount of caretaking and support for his family. Given his family's precarious state and what Dr. Al-Madani means to them, he requests a downward departure to allow him to fulfill these important obligations.

### D.    Other considerations

While released on bond and throughout trial, Dr. Al-Madani wore a location-monitoring ankle bracelet and followed curfew and no-contact restrictions. He abided by his bond conditions without incident for 21 months up to trial. At the time of sentencing, Dr. Al-Madani will have

---

[141] *See* **Ex. 1**, Letters in Support of Dr. Al-Madani.

[142] USSG §5H1.10, cmt. (n.1(B)).

[143] *See* Dr. Sunna Letter, **Ex. 1(a)**; George Al-Madani Letter, **Ex. 1(b)**.

served over six months of imprisonment. During this time, he has had no incidents or other disciplinary issues.

As an added consequence of this case, Dr. Al-Madani will likely be subject to removal proceedings after any sentence, which could result in his deportation. Given his guilty verdicts, he has limited relief from removal.

Dr. Al-Madani remains a licensed dentist and hopes to continue practicing in his profession after completing his sentence. To help him maintain his trade skills, he expresses his desire to volunteer and perform community service as a condition within his sentence. He has experience working in a variety of clinically difficult environments that other dentists typically avoid. Any such arrangement could also enable Dr. Al-Madani to support his family and contribute to any restitution, while providing dental services to those in need.

## VII.    PURPOSES: JUST PUNISHMENT AND DETERRENCE

By statute, the sentence shall not be greater than necessary to comply with the purposes behind imposing a sentence in 18 U.S.C. § 3553(a)(2). Determining the sentence requires consideration of the need for the sentence—

   (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)    to afford adequate deterrence to criminal conduct;

   (C)    to protect the public from further crimes of the defendant; and

   (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Of these factors, only the first two, (A) and (B), factor meaningfully into Dr. Al-Madani's sentence. The specific-deterrence interest in subsection (C) is not a compelling factor when applied to Dr. Al-Madani. Before this case, Dr. Al-Madani had no record of criminal activity and

had earned a good reputation in the community.[144] As relayed by those who know Dr. Al-Madani outside of this case, his behavior as part of these schemes represented a rare lapse in judgment for a man who strives to do his best for others.

Subsection (D) similarly does not weigh heavily into Dr. Al-Madani's sentence.[145] In terms of rehabilitative "correctional treatment," however, Dr. Al-Madani, his family, and the community would be ill-served by a sentence that detains him without any release conditions. Allowing Dr. Al-Madani appropriate conditions for release would facilitate his reintegration into the life he had been pursuing before MetroHealth.

### A.      Dr. Al-Madani's limited role in the corrupt activities necessitates a less severe sentence to reflect the seriousness of his conduct and to provide a just punishment.

The general retributive interests in subsection (A) necessitate some punishment for Dr. Al-Madani. But he was not a central figure in the corruption. He participated sparingly and at the behest of others who stood more to benefit—specifically Dr. Hills, the primary plotter, who regularly misled others and abused his personal and professional relationships to pursue his personal financial agenda. Evidence showed that Dr. Al-Madani had a nominal role in each part of the case—in terms of both the extent and nature of his involvement.[146]

---

[144] *See generally* **Ex. 1**, Letters in Support of Dr. Al-Madani.

[145] Dr. Al-Madani needs continuing medical care for hypertension, high cholesterol, pre-diabetes, and sleep apnea.

[146] *See* section V.E above; *see also United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (affirming just-punishment analysis resulting in a downward departure based on the "serious, serious, serious" nature of the offense being tempered by the defendant's lack of greedy, self-serving intentions); *United States v. Lay*, 568 F. Supp. 2d 791, 808–10 (N.D. Ohio 2008) (varying sentence level down six levels because the loss to the government did not accrue to the benefit of the defendant).

Evidence pointed to other conspirators as having greater involvement, making him the least culpable of those involved. Dr. Al-Madani was not involved in many aspects of the offenses, including interacting with the Ohio State Dental Board, Anthony Jordan, Ms. Wang's checks to Dr. Hills, assignment of D-1 procedures, and most gifts given to Dr. Hills.

Importantly, Dr. Al-Madani stood little to gain from the schemes. Abiding by Dr. Hills's requests was simply required "to practice normal dentistry"—doing so was not voluntary.[147] The evidence never showed that he received a direct payment from the schemes. And where evidence showed that other conspirators discussed backdoor exchanges, the same was not shown of Dr. Al-Madani.[148] At most, Dr. Al-Madani benefited by (1) having his working hours compressed into four days and (2) his private office receiving Medicaid referrals from MetroHealth. Yet the evidence bore out neither as a real benefit to him. The four-day workweek policy started almost years before Dr. Al-Madani gave anything of value to Dr. Hills, and neither he nor Dr. Elrawy, a cooperating co-conspirator, perceived it as something they got in return for a gift.[149] As Dr. Elrawy testified, the gifts to Dr. Hills were just the cost of keeping the peace.[150] The Medicaid referrals were not a material benefit either. Besides the evidence that a minimal number of referrals were actually made, Medicaid referrals do not generate profit for private dental offices. As Dr. Elrawy commented referring to such an arrangement, "You lose money."[151]

---

[147] Elrawy Tr. 4346:13–4347:5, 4676:19–4677:1, 4751:22–4752:6, 4675:19–4677:1.

[148] *See, e.g.*, Elrawy Tr. 4387:11–4388:13 (apartment rent for incentives); *id.* at 4493:8–4496:16 (money for patient referral).

[149] Elrawy Tr. 4679:8–4683:5 (testifying that the policy sought to prevent burn out); Elrawy Tr. 4637:8–23 (explaining that he did not get anything in return for giving things to Dr. Hills).

[150] Elrawy Tr. 4346:13–4347:9.

[151] Elrawy Tr. 4490:6–22.

B.       **Even before sentencing, Dr. Al-Madani's has suffered significant personal and professional hardships that reduce the need for additional punishment to effectuate adequate general deterrence.**

As with the retributive interest, there is an understandable case for some punishment of Dr. Al-Madani to afford adequate deterrence to criminal conduct. But the general-deterrence interest against Dr. Al-Madani is diminished by the hardships he and his family have experienced. As his support letters demonstrate, many people—including family, friends, and coworkers—held Dr. Al-Madani in high esteem before this case.[152] That has forever changed. Because of the convictions, his reputation is irreparably tainted. The day after the indictment, news about the case reached Jordan through newspapers and local television stations. Anyone who searches Dr. Al-Madani's name on the internet will quickly find a series of news articles identifying him as a corrupt actor. He must forever live with this stigma.

Over the pendency of this case, Dr. Al-Madani and his wife have foregone a substantial amount of income from their private dentistry offices, leaving them in a compromised financial position. While awaiting trial, Dr. Al-Madani was suspended from government- and private-insurance systems—rendering uncollectible billings for work he had done. After the suspension, Dr. Al-Madani could find work only through a temp agency, driving from Westlake to New Philadelphia for months to maintain an income. Setting up Buckeye Family Dental required a major investment, which Dr. Al-Madani and his partners largely cannot recoup. Together, his private offices have downsized from 40 employees to approximately six.

Dr. Al-Madani may also lose his ability to continue residing and working in this country, which is the only country his two children have ever known as home. Protecting his family's ability to stay in the United States was major factor motivating Dr. Al-Madani to take his case to

---

[152] *See* Letters in Support, **Ex. 1**.

trial. Upon completing his custodial confinement, Dr. Al-Madani will likely be subjected to removal proceedings.

To the professionals who could engage in conduct similar to Dr. Al-Madani's , these losses matter. Attorneys typically advise clients regarding these losses, often at a client's urging. Even though a court does not directly impose them, they are real. And they serve to strongly deter other individuals from engaging in similar criminal activity.

## VIII.  AVOIDANCE OF SENTENCING DISPARITIES

The final consideration under 18 U.S.C. § 3553(a) is the need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct. These cases indicate a ceiling for the type of white-collar corruption offenses in this case. The defendants in these cases were significantly more culpable that Dr. Al-Madani. At a minimum, they were more actively involved in schemes that resulted in much larger losses:

- **David Donadeo**, 70 months of imprisonment and 3 years of supervised release[153]

    As part of a $3.3 million fraud scheme against a public-school district, Mr. Donadeo created a shell corporation and issued fake invoices to submit to a co-conspirator, who paid them from the district. Shortly before search warrants were executed, Donadeo fled to North Carolina then to Europe. After charges were pending against for more three years, he was extradited back to the United States and indicted. He pleaded guilty to conspiracy to commit mail fraud and conspiracy to commit money laundering.

- **Mehran Javidan**, 65 months of imprisonment[154]

    Ms. Javidan organized and coordinated a large fraudulent-reimbursement scheme that resulted in a $2.2 million loss. The scheme involved securing patients' Medicare information through illegal means and using that information to submit fraudulent billings.

---

[153] *United States v. Donadeo*, 910 F.3d 886 (6th Cir. 2018).

[154] *United States v. Meda*, 812 F.3d 502 (6th Cir. 2015).

Although neither case mirrors Dr. Al-Madani offenses or his status as a first-time offender, they establish an echelon of higher-culpability cases from which Dr. Al-Madani's sentence should downwardly depart.

## IX.    CONCLUSION

Dr. Al-Madani is not the main character in this case—as reflected by his place in the indictment and the infrequency with which government witnesses invoked his name. The story of this case is about Dr. Hills—how Dr. Hills compromised an exceptional career with an escalating pattern of self-dealing and manipulation designed for his own enrichment. To a lesser degree, it's a story about Dr. Alqsous and Dr. Elrawy embracing Dr. Hills's corrupt cult of personality, striving to be the one most trusted by Dr. Hills. Only deeper into the story does Dr. Al-Madani arise as a character—as a man trying to tread water and not rock the boat, but who ends up drowning himself. To effectuate a just punishment, Dr. Al-Madani's sentence should recognize his limited wrongdoing and not ascribe to him the fatal flaws of others.

Dr. Al-Madani is deeply humbled by the jury's verdicts and accepts that they must have a consequence. He remains the same compassionate, caring professional dedicated to serving others, and he hopes that his mistakes do not compromise his ability to fulfill that purpose.

Respectfully submitted,

/s/ *Patrick Haney*                      /s/ *Richard Drucker* [per consent]

Subodh Chandra (Ohio Bar No. 0069233)     Richard H. Drucker, Esq. (Ohio Bar No. 0002466)

Donald Screen (Ohio Bar No. 0044070)      Margaret W. Wong and Associates

Sandhya Gupta (Ohio Bar No. 0086052)      3150 Chester Avenue

Patrick Haney (Ohio Bar. No. 0092333)       Cleveland, Ohio 44114

The Chandra Law Firm LLC                  (216) 566-9908

1265 W. 6th Street, Suite 400                (216) 566-1125 Fax

Cleveland, OH 44113-1326                  Richard@imwong.com

Phone: 216.578.1700  Fax: 216.578.1800

Subodh.Chandra@ChandraLaw.com

Donald.Screen@ChandraLaw.com

Sandhya.Gupta@ChandraLaw.com

Patrick.Haney@ChandraLaw.com

*Attorneys for Defendant Dr. Yazan Al-Madani*

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2019, my office served, via the Court's ECF system, the foregoing document on all counsel of record in this case.

/s/ Patrick Haney
*One of the attorneys for Defendant Dr. Yazan Al-Madani*